Kamron Keele
720 Magnolia Rd.
Barrington, Illinois 60010
(801) 661-7706
kamronkeele@gmail.com

*Pro se*

FILED IN U.S. DISTRICT COURT
DISTRICT OF UTAH
SEP 15 2025
GARY P. SEDAR
CLERK OF COURT
BY ________ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KAMRON KEELE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>SNOW HAVEN RETREAT, LLC, a Utah limited liability company, JAMES DUNN, an individual, and DAVID MUSSELMAN, an individual,<br><br>Defendants. | **COMPLAINT**<br><br>Case: 2:25-cv-00806<br>Assigned To : Bennett, Jared C.<br>Assign. Date : 9/16/2025<br>Description: Keele v. Snow Haven Retreat et al<br><br>*JURY TRIAL REQUESTED* |

Plaintiff, Kamron Keele, hereby complains against Defendants, jointly and severally, as follows:

## DESCRIPTION OF THE PARTIES

1. Plaintiff is a resident of and domiciled in Illinois.

2. Licensed in New York, Utah, and Illinois, Plaintiff has been practicing law for 25 years.

3. Plaintiff anticipates practicing law for the duration of his career.

4. Defendant Snow Haven Retreat, LLC ("*Snow Haven*"), is a Utah limited liability company doing business in Utah.

5. Defendant James Dunn ("*Dunn*") is a resident of and domiciled in Utah.

6. Dunn is an attorney practicing law in Utah.

7. Defendant David Musselman ("*Musselman*") is a resident of and domiciled in Utah.

8. Musselman is a divorce mediator practicing in Utah.

9. Musselman is the sole member and manager of Snow Haven, which owns certain real property located in Brighton, Utah ("*Property*").

## STATEMENT OF JURISDICTION AND VENUE

10. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff (an Illinois resident) and all Defendants (Utah residents or entities) and because the amount in controversy exceeds $75,000.

11. This Court also possesses subject matter jurisdiction based on a federal question pursuant to 28 U.S.C. § 1331.

12. This Court possesses personal jurisdiction over Musselman and Dunn as they are residents of and domiciled in Utah.

13. This Court possesses personal jurisdiction over Snow Haven as it is a Utah limited liability company doing business in Utah.

14. Venue is proper in the District Court of Utah pursuant to 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

***Case 1***

15. Musselman is not an attorney and is not licensed to practice law.

16. In Utah, "practicing law" means representing the interests of another person by informing, counseling, advising, assisting, advocating for, or drafting documents for that person through applying the law and associated legal principles to that person's facts and circumstances. (Utah Sup. Ct. Pro. Prac. 14-802(b).)

17. Practicing law in Utah without a license is prohibited by statute pursuant to Utah Code Ann. § 78A-9-103.

18. In late 2018 and early 2019, Musselman practiced law by, among other things, preparing legal filings (*e.g.*, an answer to a petition for divorce) and legally advising and advocating for his client ("*Stoddard*") in connection with her divorce litigation.

19. Plaintiff represented Stoddard's husband in that divorce case (*i.e.*, he was opposing counsel to Stoddard).

20. Musselman—as Stoddard's legal counsel in the unauthorized and unlawful practice of law—advised her on her particular facts and circumstances that Plaintiff's actions as opposing counsel in her divorce case were unethical, and he further advised Stoddard to file a bar complaint against Plaintiff for the same.

21. On that same day, acting on Musselman's legal advice, Stoddard filed a bar complaint against Plaintiff.

22. Some six months later (in late 2019), after thoroughly investigating Stoddard's complaint and Plaintiff's actions in the divorce case, the Utah State Bar determined that there was insufficient evidence of any ethical violations and dismissed Stoddard's complaint.

23. In 2020, Plaintiff sued Musselman in Utah state court asserting, among other claims, tortious interference (*e.g.*, Musselman advising by improper means his client to file a meritless bar complaint against Plaintiff causing him economic injury)("*Case 1*").

***Case 2***

24. In October 2021, the court in Case 1 ordered Musselman to pay Plaintiff $4,950 as a sanction for failing to comply with the court's discovery orders.

25. Pursuant to Utah's Uniform Voidable Transactions Act (Utah Code Ann. § 25-6-101 *et seq*., the "*Act*"), Plaintiff became at that time a "creditor" to Musselman, the $4,950 became Musselman's "debt," Musselman became a "debtor" to Plaintiff, and Plaintiff had a "claim" against Musselman.

26. In November and December of 2021 and again in January of 2022, Musselman made several monthly payments on the $4,950 sanction reducing the debt to $4,150.

27. At the same time he stopped paying Plaintiff monthly on that debt, on or about February 8, 2022, Musselman instead transferred by warranty deed the Property from himself individually to Snow Haven.

28. The February 2022 transfer of the Property from Musselman to Snow Haven constitutes a "transfer" (as defined in the Act) with respect to Plaintiff, who at the time of the transfer was an existing (since October 2021) creditor of Musselman.

29. Put differently for emphasis, Musselman transferred the Property to his wholly owned company, Snow Haven, several months after becoming a debtor to Plaintiff.

30. The transfer of the Property by Musselman to Snow Haven was made without Musselman receiving "reasonable equivalent value" (as defined in the Act) from Snow Haven in the exchange.

31. Evidenced by multiple declarations made by Musselamn under criminal penalty, Musselman was also "insolvent" (as defined in the Act) at the time.

32. In September of 2022, Plaintiff obtained two formal judgments against Musselman in Case 1, one of which was for the previously ordered but unpaid amount of $4,150 (again, Musselman stopped paying monthly after January 2022 and transferred the Property to Snow Haven instead) and the other judgment in the amount of $161,000 with respect to Musselman's adjudged tortious interference.

33. Shortly thereafter, in late September 2022, Plaintiff attempted to collect on those two judgments and recorded with Salt Lake County Recorder's Office a notice of judgment against the Property.

34. In 2023, Snow Haven sued Plaintiff in Utah state court alleging wrongful lien, and asserting $580,000 in treble damages, with respect to Plaintiff's recording of the notice of judgment against the Property; alleging that the Property was owned by Snow Haven, and

not Musselman individually, at the time of the recording of the notice of judgment lien, therefore the recorded notice of judgment was wrongful as to Snow Haven (*"Case 2"*).

35. In 2023, Plaintiff informed Defendants that the transfer to Snow Haven of the Property in 2022 was void pursuant to the Act.

36. Dunn, an attorney, knew or should have known that Case 2 was from its inception without merit because the 2022 transfer from Musselman to Snow Haven was void as to an existing creditor, Plaintiff.

37. Previously known as fraudulent conveyance, Utah law does not permit a debtor with an existing debt to simply transfer his property to his solely owned company to avoid paying that debt, and Defendants knew or should have known this.

38. Rather than dismissing Case 2, particularly when Plaintiff informed them specifically that the transfer was void under the Act, Dunn and Snow Haven (Musselman acting as manager and sole member) continued unabated, prosecuting Case 2 through trial.

39. Making a written false statement in a civil case in a Utah court is illegal pursuant to Utah Code Ann. § 76-8-504.

40. Snow Haven, Musselman, and Dunn made multiple false statements to the court in Case 2, including, but certainly not limited to, alleging that Snow Haven paid reasonably equivalent value to Musselman for the Property and that Musselman was solvent at the time.

***Case 3***

41. In Case 2, Defendants sought (and obtained based on false statements) a ruling from the Utah state court that, rather than Plaintiff being able to simply plead as a defense that the transfer of the Property by Musselman as void under the Act (and obtain a quick dismissal), Plaintiff must instead obtain a separate declaratory judgment holding particularly that the transfer was void.

42. In addition to having to defend the meritless Case 2, Plaintiff was forced by Defendants to sue Snow Haven in Utah state court ("*Case 3*") seeking a declaratory judgment that the 2022 transfer by Musselman to Snow Haven was void under the Act.

43. If ruled separately to be void under the Act, as argued by Defendants in Case 2, then and only then could Plaintiff show that Snow Haven lacked standing to sue Plaintiff for a wrongful lien in Case 2 (*i.e.*, the transfer from Musselman individually to Snow Haven was void and without effect and only Musselman, the Property's actual owner, has standing to sue for a wrongful lien—which, of course, would not be wrongful because the judgment in Case 1 was against Musselman individually).

44. Cases 2 and 3 were consolidated together, and a week-long trial was held in Salt Lake City from April 14 to April 18, 2025.

45. The trial court, granting Plaintiff declaratory judgment, held in Case 3 that the transfer to Snow Haven was in fact void and dismissed Case 2 for lack of standing.

46. Exactly as Defendants intended and planned, Plaintiff was forced—at significant time and expense—to defend himself for years in a meritless Case 2, and he was further forced by Defendants to prosecute Case 3, up to and including trial.

***Pecuniary Losses***

47. Since 2018, Plaintiff earns $450 an hour as an attorney in Illinois.

48. Rather than spend his time defending and prosecuting Cases 2 and 3, Plaintiff could have instead practiced law in Illinois earning $450 an hour.

49. Plaintiff spent 378 hours prior to the week-long trial defending himself in Case 2 and prosecuting Case 3.

50. Plaintiff spent another 261 hours specifically preparing for and participating in the week-long trial in Cases 2 and 3.

51. Plaintiff spent a total of 639 (378 + 261 = 639) hours defending against Defendants' meritless claims of wrongful lien in Case 2 and prosecuting Case 3.

52. For 639 hours at $450 an hour, Plaintiff lost income he could have otherwise earned in Illinois in the amount of $287,550.

53. For the week-long trial in Cases 2 and 3, Plaintiff was forced to pay $639.53 in lodging in Salt Lake City.

54. The cost for Plaintiff to travel from Illinois to Utah for trial was $725.11.

55. The court filing fees Plaintiff was forced to incur in Cases 2 and 3 was $840.

56. The cost to file all of the necessary pleadings electronically in Cases 2 and 3 was $146.

57. The cost to serve a subpoena to appear at trial to a hostile witness (Musselman's ex-wife) in Cases 2 and 3 was $57.20.

58. The cost for binders, paper, ink, and copying fees with respect to Plaintiff's trial exhibit binders for the trial in Cases 2 and 3 was $345.16.

59. The cost to obtain documents from a third party subject to subpoena in Case 2 was $132.24.

60. The cost to obtain documents from another third party subject to subpoena in Case 2 was $4.95.

61. The total lost income and costs for Plaintiff to defend against Case 2 and prosecute Case 3 is $290,440.19.

***The Letter***

62. Several months before trial in Cases 2 and 3, and shortly after the second judgment for $161,000 in Case 1 (not the separate judgment for $4,150, which was eventually paid to Plaintiff in 2025) had been reversed and remanded on appeal, Defendants made their true intentions clear and in writing with respect to filing and prosecuting Case 2 (and forcing Plaintiff to file and prosecute Case 3).

63. Defendants' intent with Case 2 was to go on the offensive against Plaintiff—to threaten and intimidate Plaintiff with a $580,000 damages claim (trebled) so that Plaintiff would not pursue Case 1 further or settle it on Defendants' terms.

64. Defendants' intent with initiating and pursuing Case 2 (and forcing Plaintiff to file Case 3) was also to interfere with Plaintiff's time and ability to earn a living as an attorney as well as to instill the fear of financial ruin.

65. On November 20, 2024, Dunn in Utah sent an email to Plaintiff in Illinois attaching a letter dated November 19, 2024 (the "*Letter*").

66. The Letter, signed by Dunn, purports to be on behalf of Dunn, Snow Haven, and Musselman.

67. The Letter provides that it "is a combined effort to resolve all pending litigation [Cases 1, 2, and 3] between you [Plaintiff] and David Musselman and Snow Haven Retreat LLC."

68. The Letter provides that "considering the statutory provision for treble damages in such cases [Case 2], it is likely that a judgment in excess of $580,000 could be entered against you. We [Dunn, Musselman and Snow Haven] discuss potential resolution to avoid further escalation."

69. The Letter provides that "To avoid further escalation, We propose settlement wherein you compensate Snow Haven the sum of $200,000. This obviously includes the quantified damages, past and current legal fees, and consideration for the additional economic and reputation penalties incurred by Mr. Musselman due to these unfortunate proceedings."

70. The Letter provides:

> If you [Plaintiff] wish to preserve the right to retry the Musselman case [Case 1] that was overturned on appeal, we are prepared to still offer settlement. This agreement would allow you to retry the case with the understanding that if you do not prevail in the retrial, you will be obligated to pay all of Mr. Musselman's attorney's fees incurred in defending the retrial. In addition, you will be required to pay an amount equivalent to these attorney's fees directly to Mr. Musselman as compensation [to him] for the inconvenience and resources expended in addressing this matter before the courts. This provision aims to fairly allocate costs should the retrial not succeed in your favor.

71. The Letter also provides:

> Bar Complaint Abstention. As part of the consideration for this Settlement Agreement, Mr. Musselman agrees to abstain from initiating, pursuing, or assisting in the initiation or pursuit of any complaint, grievance, or disciplinary proceeding against you [Plaintiff] with the Utah State Bar, related to any actions, conduct, or communications addressed in this Settlement Agreement and during the course of the Snow Haven versus Keele case [Case 2] or the Keele versus Musselman case [Case 1]. This includes, but is not limited to, any unethical conduct or breach of professional duties as an officer of the court such as reaching out to potential witnesses named by Snow Haven Retreat, and offering to represent them for free to take legal action against Mr. Musselman if they also agree to assist you in your defense and your suggestions to witnesses that you 'hate' Mr. Musselman will be included in any bar complaint.

72. The Letter continues:

> Mr. Musselman confirms he has consulted with legal counsel regarding the viability of such a bar complaint and hereby relinquishes his current pursuit of said complaint as an integral condition of this settlement. Both parties [Musselman and Snow Haven] agree that this clause is a material inducement for entering into this agreement and acknowledge their mutual desire to resolve the matter amicably without further escalation.

73. The Letter provides that "Approximately five years ago, you initiated a lawsuit [Case 1] against Mr. Musselman, following his suggestion to an individual, dissatisfied with your actions in a divorce proceeding, regarding her filing a Bar complaint against you and that this somehow damaged you."

74. In the Letter, Defendants deliberately threatened to disclose and reveal embarrassing, incriminating, and damaging information about Plaintiff in a bar complaint to the Utah State Bar.

75. In the Letter, Defendants deliberately threatened to disclose Plaintiff for witness tampering, which tampering constitutes a Federal crime pursuant to 18 U.S.C. § 1512 (and a crime pursuant to Utah law as well).

76. The Letter does not provide that it was subject to Rules 408 of the Federal or Utah Rules of Evidence.

77. The Letter similarly did not explicitly provide that it was made in confidential pursuant to settlement negotiations.

78. Rule 408 itself does not provide a blanket protection against any and all use of statements made during settlement negotiations, rather it only bars those statements used to prove liability or an amount for a claim that was disputed.

79. While Rules 408 of the Federal and Utah Rules of Civil Procedure generally protect settlement communications from being used as evidence in court, exceptions exist when those communications involve threats of blackmail or extortion. (*See, e.g.*, Becker v. Kroll, 340 F. Supp. 2d 1230, 1242 ("Rule 408 does not apply when, as here, the claim is based upon wrongful acts that took place during the compromise negotiations.")

80. Further, Rule 408 does not bar the introduction of settlement discussion if offered for another purpose, such as to show a party's knowledge or intent, or showing bias or prejudice of a witness, among other things. (*See e.g.*, Boulder Falcon, LLC v. Brown,

2024 U.S. District Court. Lexis 193982, at *12, *citing* Wine & Canvas Development, LLC v. Mullen, 868 F.3d 534, 540 (7th Cir. 2017)("Although statements made in settlement negotiations are inadmissible to prove liability on the underlying claim, they may be admissible for other purposes, including to show the defendant's . . . intent" (internal quotation marks omitted)).)

81. The threats to Plaintiff made by Defendants in the Letter fall outside of Rule 408.

82. Defendants sent the Letter to Plaintiff electronically across state lines (from Utah to Illinois) and concerns interstate commerce (specifically Plaintiff's business as an attorney earning his living in three states) seeking money from Plaintiff across state lines.

83. In the Letter, Defendants made a clear, express, specific, and wrongful—indeed criminal—threat of economic and reputational harm to Plaintiff by the filing of a bar complaint against him, which threat includes the disclosure to authorities of the crime of witness tampering.

84. In the Letter, Defendants attempted to induce Plaintiff to part with his property in the amount of $200,000 plus twice the amount of attorney's fees that Musselman would have to incur in a retrial in Case 1.

85. On May 16, 2024, Dunn filed an attorney's lien against the Property for $12,918 wherein Dunn expressed that he has not been paid by Musselman for his legal services after multiple demands in Cases 2 and 3.

***Bar Complaints***

86. As evidenced in the Letter, Defendants each knew of Stoddard's previous bar complaint against Plaintiff.

87. Similar to providing false information to a law enforcement officer, the filing of a false bar complaint in Utah is a crime pursuant to Utah Code Ann. § 76-8-506.

88. As threatened in the Letter, if Plaintiff paid Snow Haven the sum of $200,000 and Musselman for his attorney's fees (doubled), Defendants would abstain from filing yet another bar complaint against Plaintiff.

89. Put differently for emphasis, if Plaintiff did not pay Defendants the money, Defendants would file a bar complaint against Plaintiff.

90. Plaintiff did nothing unethical, and he did not tamper with any witness (as falsely accused in the Letter).

91. This demand of payment of $200,000, plus foregoing prosecution of Case 1 and agreeing to pay Musselman's attorney's fees (plus that same amount to Musselman directly), or Defendants would initiate yet another false bar complaint against Plaintiff is a direct threat to Plaintiff that would, if initiated, damage Plaintiff's reputation, his economic prospects, his ability to continue to practice law until retirement, among other things.

92. Plaintiff relies on his reputation and good standing with the Utah State Bar (and with the New York and Illinois State Bars) to obtain legal positions, to keep existing and

obtain prospective clients, and to practice law generally until his retirement, among other things.

93. A bar complaint directly affects Plaintiff's ability to earn a living, to feed his family, to pay his bills, not to mention the emotional distress and time needed to refute that bar complaint.

94. A bar complaint could result in Plaintiff being suspended or even being disbarred from practicing law entirely (in any state); even charged criminally for witness tampering as threatened by Defendants.

95. Over the past 25 years, Plaintiff has been a victim of numerous meritless, indeed frivolous, bar complaints filed against him (in addition to Stoddard's).

96. In one instance, for example, another condo owner (who suffered from mental health issues) living in the same building as Plaintiff filed at least five different bar complaints against Plaintiff (and several other attorneys on the HOA board) simply because Plaintiff was president of the building's home owner's association.

97. In another instance, Plaintiff and his former law firm partners sued each other, and Plaintiff's former partners filed a meritless bar complaint against Plaintiff in order to gain an advantage against Plaintiff in that litigation.

98. Other examples include multiple opposing parties in divorce litigation filing false bar complaints against Plaintiff (as opposing counsel) to gain an advantage against their divorcing spouse in the divorce, as seems all too common in Utah.

99. These previous bar complaints, including most recently Stoddard's, have impacted Plaintiff's reputation, his emotional well-being, and his ability to earn a living as an attorney.

100. Just the threat of filing a bar complaint, with or without merit, is sufficient to cause harm to Plaintiff's health, safety, business, career, financial condition, reputation, and personal and professional relationships.

101. The threat of filing a bar complaint was reasonably calculated by Defendants to instill fear in Plaintiff.

102. The threat of a new bar complaint, particularly in light of all of the previous complaints (including Stoddard's), was reasonably calculated by Defendants to impact Plaintiff's reputation, his emotional well-being, and his ability to continue to earn a living as an attorney until retirement.

103. Plaintiff did in fact reasonably fear, particularly based on Plaintiff's past history of baseless bar complaints, that Defendants' threats could result in disbarment and suspension, or even being prosecuted criminally for witness tampering, such that Plaintiff could no longer earn a living as a practicing attorney.

## **FIRST CAUSE OF ACTION**
## **(RICO, 18 U.S.C. § 1962(c))**

104. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 103, inclusive, of this Complaint as if fully set forth herein.

105. In addition to the actions detailed above, which began with Musselman's unlawful practice of law, followed by Musselman's unlawful legal advice to Stoddard to file a bar complaint against Plaintiff, filing the baseless Case 2 against Plaintiff, making false statements to the Utah state court, among other things, Defendants in the Letter also committed the Federal crimes of attempted extortion, blackmail, threatening extortion and blackmail in electronic communications across state lines, wire fraud, among other crimes.

106. 18 U.S.C. § 1951 makes unlawful conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do."

107. The term "extortion" for these purposes means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

108. While Plaintiff did not pay Defendants the $200,000+ extortion amount sought in the Letter (*i.e.*, with his consent to complete the crime of extortion), the statute outlaws attempted extortion as well as conspiring with others to extort.

109. The threats made by Defendants in the Letter and the other predicate acts detailed herein affected Plaintiff's business as a practicing attorney in Illinois, New York, and Utah.

110. The threats made by Defendants in the Letter and the other predicate acts detailed herein were an attempt to obtain property from Plaintiff and were induced by Defendants'

wrongful use of instilling fear of, among other things, reporting Plaintiff for witness tampering.

111. 18 U.S.C. § 875 provides separately that whoever, with the intent to extort from any person any money or other thing of value, transmits in interstate commerce any communication containing any threat to injure the property or reputation of the addressee is guilty of a Federal crime.

112. Defendants, with the intent to extort money from Plaintiff, transmitted in interstate commerce an email with the Letter containing a threat to injure the reputation of Plaintiff.

113. The threats made in the Letter constitute attempted extortion under both 18 U.S.C. § 1951 and 18 U.S.C. § 875.

114. 18 U.S.C. § 873 provides that whoever, under threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both.

115. Defendants threatened to abstain from reporting Plaintiff to the Utah Bar for witness tampering (a violation of any law of the United States), but only if Plaintiff paid them money.

116. The Letter constitutes blackmail under 18 U.S.C. § 873.

117. 18 U.S.C. § 1343 makes it a crime using wire communications to plan or scheme with the intent to defraud, which is reasonably foreseeable that the wire communications

will be used, and with actual use of those wires, to further the scheme in order to deprive an owner of his property or money.

118. Defendants, upon information and belief, using emails and telephone calls in November 2025, discussed and agreed on the contents of the Letter, discussed and agreed on the plan to threaten Plaintiff with yet another false bar complaint therein unless Plaintiff pays Defendants $200,000 (plus Musselman's attorney's fees incurred thereafter in Case 1 doubled), and they schemed together to defraud Plaintiff of his property or money.

119. Defendants each agreed to make the threats against Plaintiff in the Letter.

120. While the Federal crimes themselves detailed above do not provide for a private right of action, the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. §§ 1961 to 1968)("*RICO*") allows private parties harmed by a pattern of racketeering activities to bring civil suits for treble damages.

121. The elements of a RICO violation are (a) a culpable "person" who (b) willfully or knowingly (c) commits or conspires to the commission of "racketeering activity" (d) through a "pattern" (e) involved a separate "enterprise" or association of fact and (f) an effect on interstate commerce.

122. 18 U.S.C. § 1961(3) provides that a culpable "person" is an individual or entity capable of holding a legal or beneficial interest in property.

123. Defendants are individuals and an entity that are capable of (and indeed do) hold a legal or beneficial interest in property generally and the Property specifically.

124. Each Defendant intended, willfully and knowingly, to commit and conspire in the conduct culminating in the Letter with actual knowledge of and consent to the predicate acts of attempted extortion, blackmail, wire fraud, among the other unlawful acts detailed herein.

125. Each Defendant also recklessly engaged in the conduct culminating in the Letter with respect to the predicate acts detailed herein.

126. 18 U.S.C. § 1961 defines "racketeering activity" broadly to encompass any of the state and federal predicate offenses listed in section 1961(1), which includes extortion, blackmail, etc.

127. Each Defendant committed the predicate acts detailed herein, which acts are listed in 18 U.S.C. § 1962(1).

128. 18 U.S.C. § 1961(5) defines a "pattern" as requiring at least two acts of racketeering activity the last of which occurred within ten years after the commission of a prior act of racketeering acts.

129. The racketeering activity, or pattern, first started when Musselman practiced law without a license, which is prohibited by statute, and when he advised Stoddard to file a false bar complaint, a crime in Utah.

130. The racketeering activity continued when Defendants brought Case 2 against Plaintiff.

131. The racketeering activity continued when Defendants made false statements to the court in Case 2.

132. The racketeering activity continued when Defendants conspired against Plaintiff by pursuing Case 2 despite that the transfer of the Property was void under Utah law.

133. The racketeering activity continued when all Defendants, using electronic communications, schemed to defraud Plaintiff of his property and money, to deprive him of his rights in Case 1, among other things.

134. The racketeering activity culminated ultimately in the unlawful extortion and blackmail expressed in the Letter.

135. 18 U.S.C. § 1961(4) defines an "enterprise" as any individual, partnership, corporation, association or other legal entity, or any union or group of individuals associated in fact though not a legal entity.

136. Defendants constitute such an enterprise as they are a group of individuals and a limited liability company that are associated in fact with a common or shared purpose among its members with continuity of structure, and functioning as a continuing unit, sufficient to permit those associates to pursue the enterprise's purpose.

137. An enterprise is involved in "interstate commerce" if the predicate acts of racketeering affects interstate commerce.

138. Defendants with the predicate acts detailed herein and the Letter sent across state lines affected Plaintiff's business as an attorney in multiple states and in interstate commerce.

139. 18 U.S.C. § 1962(C) requires that a plaintiff must have standing for a civil RICO claim.

140. 18 U.S.C. § 1964(c) provides that a plaintiff satisfies this standing requirement if the plaintiff is (1) a person (2) who sustains injury (3) to its business or property (4) by reason of the defendants' violation of Section 1961.

141. Plaintiff is a person who sustained pecuniary injury to his business as an attorney with significant lost income by reason of and caused by Defendants' violation of RICO.

142. 18 U.S.C. § 2 provides that whoever commits a Federal offense or aids, abets, counsels, commands, induces, or procures its commission (including the Federal offenses of attempted extortion and blackmail) is punishable as a principal.

143. Defendants willfully aided, abetted, counseled, commanded, induced, and procured the Letter and the threats to Plaintiff therein, and Musselman is a principal for Snow Haven for these actions under Federal law.

144. 18 U.S.C. § 2 also provides that whoever willfully causes an act to be done which if directly performed by him or another would be a Federal offense is punishable as a principal.

145. As a result of Defendants collective actions detailed herein, Plaintiff has been damaged (in lost income, costs, and payment of expenses related to Cases 2 and 3) in an amount to be determined at trial but not less than $290,440.19, trebled by statute to $871,320.57.

**SECOND CAUSE OF ACTION**
**(Pattern of Unlawful Acts, Utah)**

146. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 145, inclusive, of this Complaint as if fully set forth herein.

147. Similar to Federal RICO, Utah Code Ann. § 76-17-401 *et seq.* provides for a private right of action to recover for damages suffered for patterns of at least three episodes of interrelated and continuing unlawful activity (which includes but are not limited to various criminal activities alleged herein such as making a false written statement and violations of 18 U.S.C. § 1962(C)) that are either related to each other or to an enterprise.

148. As alleged above with the various predicate acts, and consisting of at least three episodes of interrelated and continuing unlawful activity beginning with unlawful practice of law to agreeing on and sending the Letter, Defendants' actions alleged herein constitute a pattern of at least three unlawful acts directed against Plaintiff.

149. As a result of Defendants collective actions, Plaintiff has been damaged (in lost income, costs, and payment of expenses related to Cases 2 and 3) in an amount to be determined at trial but not less than $290,440.19, doubled by statute to $580,880.38.

**THIRD CAUSE OF ACTION**
**(Civil Conspiracy, Utah)**

150. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 149, inclusive, of this Complaint as if fully set forth herein.

151. In order to plead a claim for civil conspiracy, a complaint must allege sufficient facts to establish (a) a combination of two or more persons, (b) an object to be accomplished, (c) a meeting of the minds on the object or course of action, (d) one or more unlawful, overt acts, and (e) damages as a proximate result thereof. (*See, e.g.*, Israel Pagan Estate v. Cannon, 746 P.2d 785, 790 (Utah Ct. App. 1987).)

152. Defendants, acting in concert, combined to accomplish the unlawful objectives to harass and intimidate Plaintiff, damage his business and reputation as an attorney, compel him to abandon Case 1, and extort/blackmail Plaintiff to pay them money, among other things.

153. Defendants had a meeting of the minds on this unlawful course of action, as evidenced by their collaborative efforts in pursuing Case 2, making false statements to the court, and, most notably, by drafting and sending the Letter, which was a "combined effort to resolve all pending litigation."

154. The unlawful, overt acts committed in furtherance of this conspiracy also include Musselman's first acts of his unauthorized practice of law, advising Stoddard to file a meritless bar complaint, transferring the Property to evade a judgment, filing and prosecuting the baseless Case 2, and making criminal threats of extortion and blackmail in the Letter.

155. As a proximate result of this conspiracy, Plaintiff has sustained significant damages, including the loss of income and the incurrence of costs and expenses totaling

at least $290,440.19, as well as damage to his reputation and most significantly to his emotional well-being.

**FOURTH CAUSE OF ACTION**
**(Wrongful Use of Civil Proceedings, Utah)**

156. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 155, inclusive, of this Complaint as if fully set forth herein.

157. Under Utah law, a claim for wrongful use of civil proceedings requires a plaintiff prove that the defendant initiated or continued a civil proceeding against the plaintiff without probable cause and primarily for a purpose other than that of securing the proper adjudication of the claim, and the proceeding was terminated in favor of the plaintiff. (*See, e.g.*, Puttuck v. Gendron, 2008 UT App 362.)

158. Snow Haven, with the aid of Dunn and Musselman, initiated and prosecuted Case 2 against Plaintiff, alleging wrongful lien.

159. Case 2 was initiated without probable cause; Defendants knew or should have known that the underlying transfer of the Property from Musselman individually to Snow Haven was void as to Plaintiff under the Act and that Snow Haven lacked standing to sue Plaintiff.

160. Musselman, who is also the sole member and manager of Snow Haven, was personally insolvent and received no reasonably equivalent value for the transfer of the Property to Snow Haven, and Dunn, an attorney, knew or should have know this before and after filing Case 2.

161. Defendants' primary purpose in initiating and prosecuting Case 2 was not to secure a proper adjudication of a wrongful lien claim but rather to harass, threaten, intimidate, and instill fear so that Plaintiff would abandon Case 1 or settle on Defendants' terms.

162. The holding by the Utah court in Cases 2 and 3 after a week long trial confirmed that the transfer of the Property to Snow Haven was void as to Plaintiff and that Snow Haven lacked standing to sue Plaintiff from the inception.

163. As a direct result of Defendants' wrongful use of civil proceedings, Plaintiff suffered significant damages, including but not limited to the expense, costs, and lost income in having to defend in Case 2 and prosecute the related Case 3; exact amount to be determined at trial but in no event less than $290,440.19; as well as damage to his reputation and most significantly to his emotional well-being.

**FIFTH CAUSE OF ACTION**
**(Abuse of Process, Utah)**

164. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 163, inclusive, of this Complaint as if fully set forth herein.

165. In Utah, to establish an abuse of process claim, a plaintiff must demonstrate that the defendant used the legal processes and procedures for an ulterior motive or purpose and committed a definite act in the use of those processes and procedures that is not proper to the regular prosecution of the case; it involves perverting the legal process to

harass, intimidate, or coerce someone for reasons outside the legitimate goals of the legal action. (*See, e.g.*, Anderson Dev. Co. v. Tobias, 2005 UT 36.)

166. Defendants used the legal process in Case 2—and forcing Plaintiff to file Case 3 in particular—for an objective unrelated to the legal claim itself; namely to extort, harass, and coerce a settlement of Case 1.

167. Defendants took specific, unauthorized actions while using the legal processes and procedures in Case 2 to harass, intimidate, and coerce Plaintiff.

168. Case 2 was from inception without merit, yet Defendants' arguments made therein forced Plaintiff to file Case 3, among other things.

169. Transfer of the Property from Musselman individually to Snow Haven was held to be void, and Defendants not only should have known this but were informed particularly of this yet they persisted in the case, making frivolous arguments throughout up to and including at trial.

170. Plaintiff was forced to defend himself in Case 2, and forced to file Case 3, and he suffered damages from the improper use of the legal process in an amount to be determined at trial but not less than $290,440.19; as well as damage to his reputation and most significantly to his emotional well-being.

## SIXTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress, Utah)

171. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 170, inclusive, of this Complaint as if fully set forth herein.

172. In Utah, the claim intentional infliction of emotional distress requires the plaintiff prove that the defendant's conduct was outrageous and intolerable in that it offended generally accepted standards of decency and morality. (*See, e.g.*, Prince v. Bear River Mutual Ins. Co., 2002 UT 68.)

173. In the Letter, with the blackmail and attempted extortion of threatening to file yet another bar complaint against Plaintiff, and in particular to threaten to report Plaintiff of a fabricated crime of witness tampering, among the other predicate acts detailed herein, Defendants intentionally engaged in conduct toward Plaintiff that was outrageous and intolerable in that it offends the generally accepted standards of decency and morality.

174. This was done with the purpose of inflicting emotional distress; where any reasonable person would have known that such would result, and that severe emotional distress resulted, as a direct consequence of Defendants' threats.

175. In the Letter, Defendants intended to cause Plaintiff emotional distress and further acted with reckless disregard for the likelihood of causing such distress, particularly made with Defendants' actual knowledge of Plaintiff's long history of having false bar complaints filed against him.

176. Defendants' threats and actions caused Plaintiff significant emotional harm about, among other things, the future of his career, his retirement, his ability to feed his family, losing his house should he not be able to practice law, among other things.

177. Defendants' threats are willful and malicious and manifest a knowing and reckless indifference toward, and a disregard of, the rights of Plaintiff.

178. As a result of Defendants actions, Plaintiff has been damaged in an amount to be determined at trial but not less than $5,000,000.

## SEVENTH CAUSE OF ACTION
**(Tortious Interference with Economic Relations, Utah)**

179. Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 178, inclusive, of this Complaint as if fully set forth herein.

180. To succeed on a claim for tortious interference, a plaintiff must demonstrate that (i) the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (ii) by improper means, (iii) causing injury to the plaintiff. (*See, e.g.*, Anderson Dev. Co. v. Tobias, 2005 UT 36; Savage v. American Express Co., 2012 UT App 36.)

181. Plaintiff, a licensed attorney, has well-established relationships with his existing clients and he has prospective economic relationships with future clients and the broader legal community, which relationships are essential to his ability to practice law and to earn a living up until his anticipated retirement.

182. These relationships, existing and future, depend on his professional reputation and good standing with the state bar associations where he is licensed.

183. Defendants intentionally and improperly interfered with these relationships through series of wrongful and unlawful acts, which began with Musselman's instruction to Stoddard to file a meritless bar complaint and culminated in the criminal threats made in the Letter.

184. Defendants' actions were improper because they were designed to damage Plaintiff's professional reputation, instill fear and emotional distress, and coerce him into a settlement for their own benefit.

185. The wrongful and malicious nature of Defendants' actions is further evidenced by their use of the judicial system and professional regulatory bodies as tools for harassment and intimidation rather than for their intended purposes.

186. Improper means is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations or recognized common-law rules. Such acts are illegal or tortious in themselves and hence are clearly improper means of interference, as Defendants did with the predicate acts detailed herein. (*See, e.g.*, Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 308 (Utah 1982).)

187. Improper means can also be by violence, threats or other intimidation, deceit or misrepresentation, as Defendant did with Plaintiff in the Letter, among other things. (*See, e.g.*, St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 201 (Utah 1991).)

188. Improper means may also be an abuse of judicial process, as Defendants did to Plaintiff with Cases 2 (and forcing Case 3). (*See, eg.*, Eldridge v. Johndrow, 2015 UT 21, 67.)

189. Defendants knew of Plaintiff's history of having false bar complaints filed against him, in particular that of Stoddard's, and Defendants' knew of Plaintiff's economic

relationships with existing and prospective clients as a practicing attorney in Utah, Illinois, and New York, and they intentionally interfered with those relationships.

190. As a direct and proximate result of this tortious interference, Plaintiff suffered significant pecuniary and economic harm in lost income, costs, and expenses in an amount to be determined at trial but not less than $290,440.19; as well as damage to his reputation and most significantly to his emotional well-being.

WHEREFORE, Plaintiff seeks damages against Defendants as more fully set forth in the following prayer for relief.

**PRAYER FOR RELIEF**

Plaintiff prays for relief in his favor and against Defendants, jointly and severally, as follows:

1. That, pursuant to the First Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $871,320.57;

2. that, pursuant to the Second Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $580,880.38;

3. that, pursuant to the Third Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $290,440.19;

4. that, pursuant to the Fourth Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $290,440.19;

5. that, pursuant to the Fifth Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $290,440.19;

6. that, pursuant to the Sixth Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $5,000,000;

7. That, pursuant to the Seventh Cause of Action, this Court enter judgment against Defendants in favor of Plaintiff for damages and equitable relief to be determined at trial, but not less than $290,440.19;

8. for court and other costs;

9. for additional lost income that Plaintiff has had to incur to prosecute this case;

10. for post-judgment interest on any amounts awarded until paid;

11. for collection costs on any amounts awarded until paid;

12. for punitive damages; and

13. for such other and further relief as the Court deems just and proper.

DATED this 9th of September 2025.

Kamron Keele
720 Magnolia Rd.
Barrington, Illinois 60010
(801) 661-7706
kamronkeele@gmail.com

*Pro se*